# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

New Alexandria Borough and : \
Selective Insurance Company of : \
America, : \
               Petitioners : \
                : \
       v. : No. 567 C.D. 2016 \
                : Submitted:  December 2, 2016 \
Workers' Compensation Appeal : \
Board (Tenerovich), : \
               Respondent :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge \
                  HONORABLE ANNE E. COVEY, Judge \
                  HONORABLE DAN PELLEGRINI, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY \
SENIOR JUDGE PELLEGRINI           FILED: January 5, 2017

New Alexandria Borough (Employer) petitions for review of the Workers' Compensation Appeal Board's (Board) decision affirming a Workers' Compensation Judge's (WCJ) order granting Larry Tenerovich's (Claimant) petitions for penalties for failure to promptly pay for work-related medical treatment.

Employer did not pay for the work-related medical treatment not because it was not necessary, but because it contended that the Physical Therapy Institute (PTI) was not the provider of the billed services but another entity, the pt

Group, was. The dispute centers on whether the contractual arrangement and billing practice of the two providers are lawful under the Workers' Compensation Act (Act).[1]

**I.**

On January 1, 1995, cost containment amendments to the Act to reduce the cost of workers' compensation insurance to employers became effective. One of the most important was Section 306(3)(iii) of the Act, 77 P.S. § 531(3)(iii), which changed the method by which workers' compensation medical bills reimbursement could be calculated. The provision changed the charges from a cost-plus basis to one calculated on Medicare's fee schedule, which is normally a lower amount. It provides:

> [A] provider shall not require, request or accept payment for the treatment, accommodations, products or services in excess of one hundred thirteen per centum of the prevailing charge at the seventy-fifth percentile; one hundred thirteen per centum of the applicable fee schedule, the recommended fee or the inflation index charge; one hundred thirteen per centum of the DRG payment plus pass-through costs and applicable cost or day outliers; or one hundred thirteen per centum of any other Medicare reimbursement mechanism, as determined by the Medicare carrier or intermediary, whichever pertains to the specialty service involved, determined to be applicable in this Commonwealth under the Medicare program for comparable services rendered. If the commissioner determines that an allowance for a particular provider group or service under the Medicare program is not reasonable, it may adopt, by regulation, a

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.4, 2501–2708.

new allowance. If the prevailing charge, fee schedule, recommended fee, inflation index charge, DRG payment or any other reimbursement has not been calculated under the Medicare program for a particular treatment, accommodation, product or service, the amount of the payment may not exceed eighty per centum of the charge most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided.

77 P.S. § 531(3)(iii).

Notwithstanding that we are unable to find any exception to this provision requiring billing based on the Medicare fee schedule, there apparently is one because the parties assume that if a provider was in existence on January 1, 1995, when the cost containment provisions were enacted, that provider is grandfathered and still allowed to bill on a cost-plus formula. In this case, if the pt Group is the provider, because it was apparently not in existence in 1995, the billed services would be billed at 113 percent of the Medicare fee schedule. However, if PTI is the provider, because it apparently was in existence in 1995, the services can be billed using the cost-plus method. Now to the facts of this case.

## II.

## A.

After slipping and falling from a salt spreader, Claimant sustained a work-related injury to his right shoulder in March 2010 during the course of his employment with Employer and was issued a notice of compensation payable. As a result of the injury, Claimant was prescribed physical therapy, which he received

3

at a facility owned by the joint venture of the pt Group and PTI. Per the terms of the joint venture, PTI provided physical therapy services to injured workers by leasing the pt Group space and therapists and subsequently submitted bills to employers. PTI submitted bills to Employer in the total sum of $22,211.26 for therapy services rendered to Claimant for which Employer denied payment alleging that PTI was not the provider of the services.

In February 2011, Claimant filed a petition for penalties, describing the injury as a "left [sic] shoulder contusion" and requesting that penalties be assessed against Employer for having failed to pay reasonable, necessary and causally-related medical bills resulting from the treatment required as a result of Claimant's work injury. (Reproduced Record (R.R.) at 5a.) Employer filed an answer denying the allegations in Claimant's petition. Later, at a hearing, Claimant amended the petition for penalties to include a petition for review of medical treatment and/or billing.[2] Employer's answer was also amended to include a denial of the allegations set forth in Claimant's petition for review of medical treatment and/or billing.

---

[2] The petition for penalties was amended in light of our decision in *Selective Insurance Company of America v. Bureau of Workers' Compensation Fee Review Hearing Office (The Physical Therapy Institute)*, 86 A.3d 300 (Pa. Cmwlth. 2014), which involved some of the same parties and similar issues. In that case, we held that the Bureau of Worker's Compensation Fee Review Hearing Officer lacked jurisdiction to determine whether an entity was a "provider" of medical services or a billing agency, reasoning that this was a question of liability that must be determined by a WCJ.

4

**B.**

Before the WCJ, Claimant testified that after he sustained a work-related injury to his right shoulder, he was referred for physical therapy by his treating physician. He testified that he then underwent physical therapy treatment at the pt Group facility in New Alexandria, which was followed by surgery and more physical therapy at the same facility. He stated that he believed that the physical therapy was being provided by the pt Group. Claimant also testified that while he was receiving physical therapy treatment, the therapists never identified who they were working for.

To explain the relationship between the pt Group and PTI, Claimant presented the testimony of Michael Cassidy (Attorney Cassidy), an attorney who has been licensed to practice law since 1977 and focuses his practice on health law through the representation of various health care providers. Attorney Cassidy testified that he has been representing the pt Group and PTI as related to their joint venture since 2006. He testified that the purpose of the joint venture was for the pt Group to provide resources, staff and office leases to PTI so that PTI could expand their workers' compensation practice in the most cost-efficient way. He further stated that he was responsible for drafting a staffing agreement and a master office space sublease agreement for the joint venture in November 2006, and that to the best of his knowledge, the template has remained the same. Attorney Cassidy noted that a joint venture is an agreement between two separate parties to engage in a common undertaking, not a merger or acquisition, as each party continues to have a separate identity.

He went on to explain the reasoning behind the staffing agreement stating that PTI is a Medicare Part A provider and the pt Group is a Part B provider for workers' compensation purposes, and that:

> Technically Part A and Part B [p]roviders refer to the Social Security Act, the Medicare statute. Part A has traditionally been known as --- it's the section of the Social Security Act under which hospitals were paid and has become sort of a pseudonym or a nickname for cost based reimbursement, because for the longest time up until the early 1990's [sic], hospitals were paid on cost, rather than a fee schedule. Now, that Medicare pays fee schedules to hospitals. They're no longer cost based, but they still call them Part A reimbursement.
>
> Part B reimbursement was traditionally the area under the Social Security Act that paid individual providers, the physicians, physical therapists, chiropractors, providers that weren't institutions. They paid them under a Medicare fee schedule, so when people refer to Part B Providers that's a fee schedule provider.
>
> The Workers' Comp [sic] Act has basically piggybacked on that, because they refer to Part A and Part B Providers, using the same type of distinction, but for [] outpatient physical therapy centers, the wrinkle in the situation is that prior to 1994 outpatient physical therapy centers were paid on a cost basis, just like hospitals. So they fall under this group of Part A reimbursement.
>
> Beginning in [sic] January 1st, 1995, outpatient physical therapy --- new outpatient physical therapy centers are paid on a Medicare fee schedule, which is traditionally the Medicare fee schedule plus 113 percent, but for outpatient physical therapy providers existing as of the time they changed the rules, they were grandfathered under the old statute. They're still called Part A Providers, although they are technically Part B Providers. And they were allowed to elect to remain reimbursed on a cost basis.

6

(R.R. at 56a-57a.) He testified that PTI was already in existence as of January 1, 1995, and it elected to continue to be paid on a cost basis, or Part A.

Attorney Cassidy testified that the joint venture provides that PTI lease space and staff from the pt Group at a number of locations to see workers' compensation patients as allowed under Medicare rules. He stated that the legal basis for the agreement between PTI and the pt Group is that the workers' compensation regulations allow outpatient physical therapy centers that existed as of 1994 to retain a cost-based reimbursement structure so that they can bill what is essentially a higher cost. He explained that not all Part A providers would have higher costs – they are individually determined – and that the cost structure for Part A providers is whatever their costs were in 1994. He further explained that the regulations state that new Part A providers will be paid under a fee schedule and that they do not prohibit any type of leasing, staffing or joint venture.

Attorney Cassidy testified that the joint venture and approximately 26 locations were approved by the Centers for Medicare and Medicaid Services (CMS).[3] He testified that the Bureau of Workers' Compensation (Bureau) has been aware of the arrangement since 2007 and has been satisfied that CMS's approvals were appropriate, and that the joint venture had been investigated by the Attorney General's office which did not find it to be illegal, improper or otherwise in violation of the law. Attorney Cassidy opined that the lease arrangements are

---

[3] Attorney Cassidy explained that for Part A providers to add new sites, they must submit an application to CMS for approval.

"entirely appropriate within the recognized reimbursement rules for Medicare that the [Bureau] follows and that there's no problem with the arrangement." (*Id.* at 147a-148a.)

Claimant also presented the testimony of Ryan Christoff (Mr. Christoff), PTI's President, who reviewed a package of bills resulting from Claimant's physical therapy treatments and testified that PTI's employees are leased employees who are employed by both PTI and another employer. He testified that PTI bills for the activities that leased employees perform on behalf of PTI, and that the leased employees are employees for the purposes of the treatment they provide on behalf of PTI and they are held under PTI's malpractice insurance.

Mr. Christoff denied that PTI bills for work that is performed by the pt Group, testifying that PTI leases its space and its employees for certain periods of time to treat PTI's patients. He further testified that PTI has physical therapists who work directly for PTI and that PTI owns certain clinics. He testified that some of the therapists who work at PTI-owned clinics do not work solely for PTI, and that they also do home care and other activities. He added, however, that none of PTI's therapists work for the pt Group. He further testified that PTI pays a flat fee for the services of the pt Group's employees pursuant to the staffing and leasing agreements, which is not related to the number of patients or to a particular patient. He explained that PTI leases the pt Group employees and that they remain the pt Group employees during the time they are leased. Mr. Christoff added that the leased employee does not charge PTI for the services, but instead provides PTI

8

with the information necessary so that PTI can prepare the billing to be sent out to the insurance carrier.

Claimant also presented the testimony of Michael Smith (Mr. Smith), a senior investigator in the special investigative unit for Employer's insurance carrier, Selective Insurance Company. Mr. Smith testified that from his review of the bills pertaining to Claimant's care, it was unclear as to who was providing the service, but that he believed PTI was not the actual health care provider. He acknowledged that after he started his investigation, he spoke with Attorney Cassidy regarding the questions that he had about the relationship between PTI and the pt Group and that Attorney Cassidy indicated that the original agreements had been provided to the Attorney General's office. Mr. Smith stated, however, that he had contacted the Attorney General's office about the case but never heard back. Mr. Smith further testified that he had no information from any state or federal law enforcement agency indicating that the arrangement between PTI and the pt Group was unlawful, that he had no information from CMS or the Bureau that the arrangement was unlawful, and that he had no information from any fraud investigative unit that the arrangement was unlawful.

Claimant also presented the testimony of Sherry Myers (Ms. Myers), Selective Insurance Company's lead bill reviewer; Charita Farley (Ms. Farley), a medical claims specialist for Eastern Alliance Insurance Group; and Shannon Vissman (Mr. Vissman), Chairman of PTI. Ms. Myers testified that Linda Schmac (Ms. Schmac) brought the bills at issue to her attention and that the main reason the bills were denied was because, based on a review of the bills and Claimant's

9

medical records, it did not appear that the provider that billed the treatment was the provider that rendered the treatment. Ms. Farley testified that nothing on the face of the bills in question indicated that they should not be paid or that the provider billing the treatment was not the provider rendering the treatment. Finally, Mr. Vissman testified that there was a history of litigation between him and Ms. Schmac pertaining to allegations of impropriety in billing and fraudulent practices, and that the issues were ongoing.

## C.

In opposition, Employer submitted the testimony of Joseph Chrillo (Mr. Chrillo), a partner in the pt Group, who testified that the sublease agreement between PTI and the pt Group involved a joint venture in which PTI leases office space and employees on a case-by-case basis to provide physical therapy to PTI patients in workers' compensation cases. He testified that it is possible that while providing physical therapy treatment through PTI to an injured worker, treatment may also be provided to an individual seeking treatment for a non-work-related problem. He stated that he did not know whether PTI was able to charge more for the same services that the pt Group provides. He explained that when a new patient comes into the facility for physical therapy treatment, a determination is made as to whether the patient is a PTI or the pt Group patient; if the patient is deemed to be a PTI patient, all employee activities involving that patient are performed as leased employees of PTI.

Employer also submitted the testimony of Dale Cordial (Mr. Cordial), owner of the pt Group, who stated that Claimant received therapy at the New

Kensington facility at which time three of the pt Group's employees were being leased by PTI. He testified that PTI leases the entire premises and that their leases are based on hours per week, not specific days, and that PTI leases the space and staff for x-number of hours per month. Mr. Cordial stated that the pt Group has nothing to do with Claimant's bills and that they were PTI's bills. He explained that when a therapist sees a patient for PTI, the therapist generates a billing slip for that day. The billing office enters the information into the computer, gets the charges that the therapist signs off on and enters those charges and codes. Those charges and codes are then transmitted to PTI. Mr. Cordial further testified that the physical therapists and secretaries have nothing to do with the agreements between PTI and the pt Group, and that he doubted that they would know who they were working for at the time a service was provided.

Lorie Myers (Ms. Myers), a workers' compensation supervisor for Selective Insurance Company, testified on behalf of Employer that there were discrepancies in the billing submitted by PTI for the services provided to Claimant.

Ms. Schmac, the owner and president of Premier Comp Solutions,[4] testified on behalf of Employer that she was aware of the leasing arrangement for space and employees between PTI and the pt Group, but that she had never come across this type of leasing arrangement in her 23 years of work, nor had she heard of any leasing arrangement between a Part A provider and a Part B provider for

---

[4] Premier Comp Solutions is a company engaged in medical management, medical cost, workers' compensation medical cost containment services, and medical bill review and repricing.

11

physical therapy. She also testified that she reported PTI and the pt Group's relationship to the Attorney General's office, CMS and the Bureau.

## III.

Finding as credible Attorney Cassidy's testimony that the joint venture has been disclosed to CMS and the Bureau and investigated by the Attorney General's office with no finding of illegality, and concluding that Employer has failed to produce any evidence that would refute the testimony of Attorney Cassidy, the WCJ granted Claimant's petitions for penalty and for review of medical treatment and/or billing.[5] The WCJ reasoned that Employer failed to dispute that Claimant received the physical therapy treatment outlined on the bills submitted by PTI or that the bills remain unpaid and outstanding. He noted that Employer has never received any indication from any federal or state authority that the billing arrangement between PTI and the pt Group is impermissible in any way. Further determining that Employer did not have a reasonable basis to contest the matter, the WCJ ordered Employer to pay Claimant's counsel fees in the amount of $8,217.50. The WCJ also ordered that Employer reimburse Claimant's counsel for all reasonable and necessary litigation costs incurred in the amount of $2,915.60.

Employer appealed to the Board, essentially arguing that the WCJ failed to take into account the totality of the evidence and the actual operation of

---

[5] The WCJ further accepted the testimonies of Claimant, Ryan Christoff, Dale Cordial, Shannon Vissman, Joseph Chrillo and Charita Farley as credible in their entirety, and found the testimonies of Michael Smith, Sherry Myers, Linda Schmac and Lorie Myers credible in part and incredible in part.

12

the entities in question. Arguing that the evidence establishes that services were provided by the pt Group employees and billed by PTI at Part A rates, Employer alleged that the staffing and leasing agreements are an improper means to allow the pt Group to charge Part A rates. Moreover, Employer argued that the WCJ's conclusion that Employer unreasonably contested the matter was factually erroneous and not the product of a reasoned decision.

Noting that the WCJ found credible Attorney Cassidy's testimony that the joint venture was legal and found credible Mr. Farley's testimony that there was nothing on the face of the bills and supporting documentation to indicate that the bills should not be paid or that the provider billing the treatment was not the provider rendering the treatment, the Board found that the WCJ's decision was grounded in credibility determinations, which were his to make, and affirmed the WCJ.

With regard to the issue of attorney's fees, the Board reasoned that the WCJ did not err in concluding that Employer's contest was unreasonable because the WCJ found that Employer failed to submit any evidence to refute PTI's status as the provider or any evidence to demonstrate any illegality about the joint venture. The Board further noted that the WCJ found that Claimant's witnesses' testimonies supported the legitimacy of the joint venture, which Employer could not contradict. Finally, the Board found that the WCJ properly found that Employer had no factual or legal basis for its belief that the treatment was not

13

actually rendered by the provider that billed for the services. This appeal by Employer followed.[6]

## IV.

### A.

The determinative issue in this appeal is whether the WCJ correctly found that the joint venture between PTI and the pt Group was lawful, thereby enabling PTI to bill for services rendered. Because the physical therapy services were rendered to Claimant by the pt Group and billed by PTI, Employer argues that the pt Group is the health care provider, not PTI and, thus, PTI is not entitled to payment under the Act. Employer asserts that "[a]s a Part B provider, pt Group portrayed themselves [sic] as the provider to [Claimant] and allowed PTI to represent themselves to [Employer's insurance] as the provider in order to charge Part A rates." (Employer's Brief at 17.) Employer argues that because the pt Group is the provider, services should be billed at the Part B rate and its insurance company did not violate the Act by not paying PTI's bills.

---

[6] In a workers' compensation proceeding, this Court's scope of review is limited to determining whether there has been a violation of constitutional rights, whether errors of law or a violation of appeal board procedures have been committed, and whether necessary findings of fact are supported by substantial evidence. *Lehigh County Vo-Tech School v. Workmen's Compensation Appeal Board (Wolfe)*, 652 A.2d 797, 799 (Pa. Cmwlth. 1995). "Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. . . . In performing a substantial evidence analysis, this [C]ourt must view the evidence in a light most favorable to the party who prevailed before the factfinder." *Waldameer Park, Inc. v. Workers' Compensation Appeal Board (Morrison)*, 819 A.2d 164, 168 (Pa. Cmwlth. 2003) (citation omitted).

14

Section 306(f.1)(1)(i) of the Act requires that employers pay "for reasonable surgical and medical services, services rendered by physicians or other health care providers ... medicines and supplies, as and when needed." 77 P.S. § 531(1)(i). Employers must pay a claimant's medical bills within 30 days of receiving them, "unless the employer or insurer disputes the reasonableness or necessity of the treatment provided pursuant to [Section 306(f.1)(6) of the Act, 77 P.S. § 531(6) ]." 77 P.S. § 531(5).

Here, there is no dispute as to whether Claimant's physical treatment was necessary or whether Employer needs to pay for his treatment. Rather, the conflict is over whether Employer needs to pay PTI's bills given that it believes that the pt Group was the health care provider. As noted by the WCJ, the agreement between PTI and the pt Group, under which PTI leases space and staff from the pt Group and bills insurance carriers for the services provided to patients, is acceptable under the applicable law. The WCJ relied on and found as entirely credible Attorney Cassidy's testimony with which he established that CMS and the Bureau are aware of the joint venture, and that the joint venture had been investigated by the Attorney General's office with no finding of illegality. Moreover, the WCJ found that the evidence produced by Employer did not contradict the finding that the joint venture was lawful. Employer provides no analysis or reasons that we should find otherwise.

**B.**

Employer next argues that the WCJ erred in awarding Claimant unreasonable contest attorney's fees.

15

Pursuant to Section 440(a) of the Act,[7] 77 P.S. § 996, in any contested case where an insurer contests liability in whole or in part, a WCJ shall award counsel fees to an employee in whose favor the matter has been finally adjudicated unless the employer provides a reasonable basis for the contest. "Section 440 ... is intended to deter unreasonable contests of workers' claims and to ensure that successful claimants receive compensation undiminished by costs of litigation." *Eidell v. Workmen's Compensation Appeal Board (Dana Corp.)*, 624 A.2d 824, 826 (Pa. Cmwlth. 1993) (citation omitted). The issue of whether an employer's contest is reasonable is a legal conclusion based on the WCJ's findings of fact. *Yespelkis v. Workers' Compensation Appeal Board (Pulmonology Associates Inc.)*, 986 A.2d 194 (Pa. Cmwlth. 2009). The reasonableness of an employer's contest depends on whether the contest was prompted to resolve a genuinely disputed issue or merely to harass the claimant. *Id.*

In the present case, the WCJ found that Employer had failed to sustain its burden of proving a reasonable contest, explaining in pertinent part:

> Employer denied the medical bills at issue alleging that PTI was not the provider of the services. However, the Employer has failed to submit any evidence during the course of these proceedings to refute PTI's status as the provider of the treatment at issue. The Employer has failed to submit any evidence contrary to PTI's position that the treatment was rendered by PTI in connection with a joint venture that was entered into between PTI and [pt Group], which was the basis for the Employer denying the bills. The Employer has not offered any evidence to demonstrate that there was anything illegal or

---

[7] Section 440(a) of the Act was added by the Act of February 8, 1972, *as amended*.

16

> improper about the joint venture between PTI and [pt Group]. To the contrary, the [i]nsurer's senior investigator, Mr. Smith, admitted that he had developed no evidence during the course of his investigation that the joint venture was in [any] way illegal or improper.

(R.R. at 1401a, ¶16.) Given Employer's failure to provide any evidence that establishes the alleged illegality of the joint venture or PTI's status as a health care provider, we agree with the WCJ that Employer engaged in an unreasonable contest and the award of attorney's fees is proper.

      Accordingly, the Board's order is affirmed.


_____
DAN PELLEGRINI, Senior Judge


Judge Hearthway did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

New Alexandria Borough and : 
Selective Insurance Company of : 
America, : 
               Petitioners : 
                : 
           v. : No. 567 C.D. 2016
                : 
Workers' Compensation Appeal : 
Board (Tenerovich), : 
               Respondent : 

**O R D E R**

AND NOW, this 5<u>th</u> day of <u>January</u>, 2017, the order of the Workers' Compensation Appeal Board dated March 10, 2016, at No. A14-0938, is affirmed.

_____
DAN PELLEGRINI, Senior Judge